**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ESTATE OF JACK HERBERT PECHTER, by its personal representative, Shelly Pechter Himmelrich,<br><br>*Plaintiff,*<br><br>v.<br><br>CREMELLO INVESTMENTS D, L.P., and JADE MOUNTAIN PARTNERS, LLC,<br><br>*Defendants.* | Case No. _____ |

## COMPLAINT

Plaintiff, the Estate of Jack Herbert Pechter, by its personal representative, Shelly Pechter Himmelrich (the "Estate"), brings this Complaint against Defendants, Cremello Investments D, L.P. ("Cremello"), and Jade Mountain Partners, LLC ("Jade Mountain"), and in support thereof alleges as follows.

## INTRODUCTION

1. This action involves a $12.5 million stranger-originated life insurance ("STOLI") policy (the "Policy"). It was procured on the life of Jack Pechter in violation of Delaware's Constitution, insurable interest laws, and public policy.

2. The Policy was originated and procured by a family of interrelated Delaware entities known generally as Coventry. Coventry operated a STOLI program that generated, for issuance to Delaware statutory trusts, large numbers of multi-million-dollar STOLI policies, including the Policy here.

3. After Mr. Pechter died in 2024, the Policy's death benefit was paid to and received by Wells Fargo Bank, N.A. ("Wells Fargo") in its capacity as the Policy's beneficiary of record

and owner of record, and was then paid to and received by Cremello, as the Policy's beneficial owner.

4.        Under Delaware's long-standing common law, as codified by 18 Del. C. § 2704(b), and as confirmed recently by multiple courts, including the Delaware Supreme Court, the Estate is entitled to recover the Policy's death benefit from Cremello, together with prejudgment interest. *See Wells Fargo Bank, N.A., et al. v. Estate of Malkin*, 278 A.3d 53, 61 (Del. 2022) ("*Malkin I*") ("Section 2704(b) confers standing on the estate and codifies the longstanding common-law rule that, if the insurer pays the death benefit on a policy that lacks an insurable interest, the estate may sue to receive that benefit.") (footnote omitted); *Estate of Barotz v. Vida Longevity Fund*, 2022 WL 16833545, at *12–13 (Del. Super. Ct. Nov. 9, 2022) ("*Estate of Barotz*") (granting summary judgment for estate of STOLI insured and awarding policy's death benefit, with prejudgment interest, to the estate), *aff'd*, 320 A.3d 212 (Del. 2024); *Lavastone Capital v. Estate of Berland*, 266 A.3d 964, 970–74 (Del. 2021) ("*Estate of Berland I*") (addressing certified questions and confirming that "if a death benefit is paid under an insurance policy that lacks an insurable interest, the estate of the insured may recover the death benefit from the recipient"); *Estate of Berland v. Lavastone Capital*, 2022 WL 15023450 (D. Del. Sept. 28, 2022) ("*Estate of Berland II*") (awarding, in light of the foregoing decision of the Delaware Supreme Court, STOLI policy's death benefit to the insured's estate, plus prejudgment interest); *Estate of Malkin v. Wells Fargo Bank*, 2022 WL 2285884, at *3 (11th Cir. 2022) ("*Malkin II*") (affirming judgment holding the recipients of the proceeds of a STOLI policy jointly and severally liable to the insured's estate).

5.        Jade Mountain is jointly and severally liable with Cremello. Jade Mountain served as Cremello's agent and investment manager, and in those capacities facilitated and substantially assisted Cremello's acquisition of the Policy and collection of its death benefits. At all relevant

times, Jade Mountain knew that those actions, and the Policy itself, were illegal under Delaware law. Accordingly, Jade Mountain is liable for participating in a conspiracy to violate Delaware law and for aiding and abetting Cremello's violation of Delaware law.

## PARTIES

6.      Jack Pechter was a citizen of Florida at the time of his death. Under 28 U.S.C. § 1332(c), the Estate is therefore a citizen of Florida.

7.      Cremello is a hedge fund structured as a partnership under the laws of the Cayman Islands. As will likely have evidentiary support after a reasonable opportunity for discovery or further investigation, Cremello's limited partnership interests are held by a private limited company incorporated under the laws of Ireland or a sub-fund of an Irish Collective Asset-Management Vehicle incorporated under the laws of Ireland. Cremello is therefore a citizen of Ireland.

8.      Jade Mountain is a limited liability company formed under the laws of Delaware. Its owner is David Marinoff, a citizen of New York. Therefore, Jade Mountain is a citizen of New York.

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and because there is complete diversity of citizenship between, on the one hand, the Estate, which is a citizen of Florida, and, on the other hand, Cremello, which is a citizen of Ireland, and Jade Mountain, which is a citizen of New York.

10.     This Court has personal jurisdiction over the defendants, and venue is proper in this District, for a number of reasons. At all times relevant to the claims asserted here, Cremello was managed and operated by persons in this District employed by Jade Mountain, which has its principal place of business in this District. Those persons, while in this District, engaged in various

3

activities with respect to the Policy, and in so doing acted for the benefit of, with the knowledge and consent of, and under some control by, Cremello, which had hired Jade Mountain to manage and operate it. For example, they advised Cremello to purchase the Policy from another entity; they negotiated with that entity and other parties in connection with that purchase; and they engaged in communications with Cremello about those negotiations. During the period when Cremello beneficially owned the Policy, they regularly conducted valuations of the Policy; on the basis of those valuations advised Cremello to keep the Policy in effect and to continue to pay the Policy's premiums; determined the optimal amounts and dates of those premium payments; monitored the Policy and ensured that premiums were being paid in the amounts and on the dates that were deemed optimal; and communicated with and consulted Cremello about the Policy. After Mr. Pechter died, they directed Wells Fargo—which, in its role as Cremello's agent and securities intermediary, served as the Policy's owner of record and beneficiary of record—to claim the Policy's death benefit and then to transfer the death benefit to Cremello, as the Policy's beneficial owner. The foregoing facts are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

11.     In addition to the foregoing, Cremello, through Jade Mountain, engaged Wells Fargo to serve as Cremello's agent and as its purported securities intermediary with respect to the Policy (and various other policies beneficially owned by Cremello). As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the agreement by which Cremello engaged Wells Fargo to perform those services contained a choice-of-law clause selecting New York law; contained a forum-selection clause selecting this District as well as state courts sitting in New York City; and made the securities intermediary's jurisdiction New York for purposes of the Uniform Commercial Code.

4

**BACKGROUND**

12.     This action concerns a life insurance policy controlled by and subject to Delaware law, including because the Policy was a Delaware trust-owned life insurance policy as defined under Delaware's insurable interest statute, 18 Del. C. § 2704. More specifically, Delaware's insurable interest statute defines a "trust-owned life insurance policy" as an insurance contract "issued for delivery in this State to a trust established under the laws of this State and having a trustee with its principal place of business in this State." § 2704(e)(4). Delaware's insurable interest statute further provides that a Delaware trust-owned life insurance policy "shall be governed by [Delaware's insurable interest laws] without regard to an insured's state of residency or location." § 2704(e)(4), (g). Here, the Policy was issued for delivery to the Jack Pechter 2005 Insurance Trust, a Delaware statutory trust, and was delivered in Delaware to Wilmington Trust Company, the trust's trustee.

13.     As the Delaware Supreme Court has recognized: "Since the initial creation of life insurance during the sixteenth century, speculators have sought to use insurance to wager on the lives of strangers." *PHL Variable Ins. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059, 1069 (Del. 2011) ("*Price Dawe*"). Insurance policies that are procured by entities lacking an insurable interest in the life of the insured violate Delaware's insurable interest requirement and public policy. *Id.*

14.     Although human-life wagerers have existed for hundreds of years, never has the problem of human life wagering been more widespread or involved such vast amounts of money than in recent decades. In the early 2000s, institutional investors began pooling large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were securitized and sold to other investors. *See*, *e.g.*, Susan Lorde Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 192 (2010).

15.     At this time, however, there were not enough existing life insurance policies to satisfy investor demand. Investors were interested in high-face-amount policies insuring the lives of senior citizens, but there were only "a limited number of seniors who had unwanted policies of sufficiently high value." *Price Dawe*, 28 A.3d at 1070. "As a result, STOLI promoters sought to solve the supply side shortage by generating new, high value policies." *Id.*

16.     One such STOLI promoter was a family of interrelated Delaware entities known generally as "Coventry," which operated a large, Delaware-centered STOLI program that generated thousands of STOLI policies on the lives of senior citizens from all over the United States. As explained further below, Coventry operated what has come to be called a "back-end" STOLI scheme using non-recourse premium financing.

17.     Entities such as Coventry—known in the STOLI industry as "funders"—worked with a nationwide network of insurance producers, who, acting as the funders' agents, assisted the funders by, among other things, identifying senior citizens meeting the funders' investment criteria and influencing those seniors to become involved in the STOLI transactions the funders were orchestrating.

18.     The STOLI transactions orchestrated by these funders, including Coventry and its agents, were presented to hand-selected senior citizens in rosy terms that camouflaged the transactions' impropriety as a "risk-free" opportunity, "just a good deal," and similar to "hitting the lottery" or getting "bingo."

19.     The specific mechanisms by which each funder's STOLI program operated could and often did vary in one respect or another. But each shared basic similarities, including that the policies at issue were procured by third parties without an insurable interest in the insureds.

20. STOLI policies violate insurable interest laws, take advantage of senior citizens, and operate to convert legitimate life insurance products—which are designed to provide actual protection to families and others with an interest in the continued life of insureds with a genuine need for protection—into cash machines for strangers to the insureds who are more interested in seeing them dead than alive.

**Coventry's Two-Year, Non-Recourse Premium Finance STOLI Scheme**

21. Beginning in 2001, Coventry, Lavastone Capital LLC ("Lavastone"), and other parties entered into a series of requirements contracts through which Coventry agreed to originate a large number of Delaware life insurance policies that, from the start, were intended to be transferred to Lavastone and other investors.

22. To manufacture these life insurance policies, Coventry's origination program followed a set pattern. Through a network of local insurance brokers around the country, Coventry located senior citizens to serve as the insureds on new life insurance policies that Coventry would procure on each insured's life.

23. Coventry also routinely entered into non-exclusive agreements and other arrangements with local insurance brokers under which such brokers agreed to split with Coventry any commissions they received from the issuing insurance carriers, thus further adding to Coventry's financial incentive to originate new life insurance policies.

24. Before any policy was applied for, Coventry would obtain a broad Special Irrevocable Durable Power of Attorney over the potential insured, giving Coventry the power to originate and/or to provide services for any life insurance policies on the insured's life. These powers included, but were not limited to, the power to complete and execute any applications or other documents in connection with the policies' maintenance or even liquidation.

25.     Before any policy was applied for, Coventry would obtain a life expectancy report on each potential insured. Coventry would then use the information from the report to perform its own underwriting of each prospective insured before a policy on that person's life was applied for. Among the purposes of this underwriting procedure was to project how long any potential insured might live, and thus how profitable to Coventry and other investors a prospective policy might be.

26.     Once Coventry determined that a particular insured was a suitable candidate for a policy, Coventry would dictate the terms under which a policy would be applied for. With the assistance of the local insurance brokers, Coventry would start the application process by having these local insurance brokers partially complete applications for policies to be issued by insurance carriers chosen by Coventry.

27.     Once an insurance carrier made a preliminary underwriting decision about a particular prospective insured, Coventry would create and fund (sometimes with no more than a single dollar) a Delaware statutory trust in the insured's name to apply for and become the owner and beneficiary of any potential policy on an insured's life. Coventry would create and fund each Delaware trust by directing the local insurance broker to have the insured execute a number of boilerplate and non-negotiable Coventry trust documents and to nominally fund each Delaware trust, typically with one dollar. The Delaware trusts would have no other assets, would be established by and for Coventry, and typically were expressly not intended to serve any valid estate planning need for the insureds.

28.     Coventry would also have the insureds execute separate trust agreements whereby Coventry would create a second Delaware trust for each policy, called a sub-trust. Under the terms of the sub-trust agreements, all assets of the initial trusts were immediately transferred and

8

assigned to the sub-trusts, including any and all future rights or interests in any life insurance policy on the insured's life procured by Coventry through the Delaware trusts.

29.    With regard to all of the Delaware trusts, Coventry would choose the trustee, which in most, if not all, cases, was Wilmington Trust Company, a corporate trustee located in Delaware. Coventry's form trust agreement granted broad powers to Coventry's chosen trustee, including the ability to cause the sub-trust to enter into a so-called "loan" whereby Coventry would pay all premiums for any policy on the prospective insured's life. The trustee was also given the power to assign to Coventry the sub-trust's assets, including any future interest in any life insurance policy.

30.    Once this was all in place, Coventry, acting through its local insurance broker, would cause the broker to submit a formal application to the insurance carrier that had been selected by Coventry. The formal application would identify the Delaware trust in the insured's name as both the owner and beneficiary of the policy being applied for; explain that the trust had been formed in Delaware; and further explain that the initial application was signed by the insured and the trustee in Delaware. The formal application would also identify the name of the Delaware corporate trustee, with an address in Delaware.

31.    The formal application would not, however, identify the existence of the sub-trust; Coventry's involvement in the transaction; the fact that Coventry was actually paying the policy's premiums; the fact that Coventry was receiving consideration, including half of the commissions; or the fact that Coventry had previously entered into a series of contracts under which it was engaged and was required to "originate" life insurance policies for resale to other investors.

32.    The policy itself would then be issued by the Coventry-selected insurance carrier for delivery to the Delaware corporate trustee of the Delaware trust owner. The Delaware corporate trustee would then execute a policy delivery receipt in Delaware, acknowledging actual physical

9

delivery and legal acceptance of the terms of the policy in Delaware, thus creating a Delaware trust-owned insurance policy controlled by Delaware law.

33. Through its so-called "loan" with the sub-trust, Coventry would then pay the policy's premium by wire transfer, which allowed Coventry to continue to conceal its involvement in the origination and procurement of the policy. Under the terms of Coventry's "loan," Coventry obtained an immediate assignment of and control over, among other things, any policy issued to the trust and conveyed to the sub-trust.

34. But the so-called "loan" to the sub-trust was a sham. It was structured with a 26- or 30-month term with no genuine obligation for anyone to repay and no recourse to the insured. Additionally, the "loan" carried excessive interest, fees, and expenses, and was in effect designed to discourage its repayment. Indeed, the "loan" did not need to be repaid at all. Instead, the "loan" was designed so that at the end of the term, all rights and interests in both the Delaware trust that owned the policy and the sub-trust—specifically including all rights and interests in the policy—could simply be irrevocably relinquished to Coventry in full satisfaction of the "loan" and then sold by Coventry to Lavastone pursuant to the pre-existing contractual arrangement, and Lavastone would either hold the policy until maturity or resell it to another investor. Alternatively, the policy in question could be sold to Coventry for an amount in excess of the loan balance (and then sold by Coventry to Lavastone pursuant to the pre-existing contractual arrangement) or sold to a third-party for an amount in excess of the loan balance, with the sale proceeds being used to repay the loan. Either way, the thousands of policies originated by Coventry ended up in almost all instances, and as had been intended from the outset, owned by speculators with no insurable interest in the lives of the insureds.

35.    Every court that has considered Coventry's scheme under Delaware law has held, as a matter of law, that the Coventry program was a STOLI program, and that policies originated through the program are void *ab initio*. *See, e.g.*, *Estate of Barotz*, 2022 WL 16833545, at *12–13, *aff'd* 320 A.3d at 212; *Estate of Daher v. LSH*, 2024 WL 3571642, at *3, 6 (C.D. Cal. July 23, 2024) (determining on summary judgment that Coventry-procured policy was STOLI and thus void *ab initio* under Delaware law); *U.S. Bank v. Estate of Albart*, 2023 WL 7491131 (Fla. 5th Cir. Ct. Oct. 23, 2023) (same); *Estate of Diamond v. U.S. Bank*, 2023 WL 6392688 (Fla. 15th Cir. Ct. Sept. 15, 2023) (same); *Estate of Berland II*, 2022 WL 15023450 (same); *Estate of Malkin v. Wells Fargo Bank*, 379 F. Supp. 3d 1263 (S.D. Fla. 2019) (same); *Sun Life v. U.S. Bank*, 369 F. Supp. 3d 601 (D. Del. 2019) (same); *U.S. Bank v. Sun Life*, 2016 WL 8116141 (E.D.N.Y. Aug. 30, 2016), *adopted* 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017) (same); *Sun Life v. U.S. Bank*, 2016 WL 161598 (S.D. Fla. Jan. 14, 2016), *aff'd* 693 F. App'x 838 (11th Cir. 2017) (same).

### The Policy on the Life of Mr. Pechter

36.    In or around 2006, Hartford Life and Annuity Insurance Company ("Hartford") received an application for a universal life insurance policy on the life of Mr. Pechter, who was then 71 years old.

37.    The application identified the owner and beneficiary of the proposed policy as the Jack Pechter 2005 Insurance Trust (the "Trust"). It described the trustee as Wilmington Trust Company, located at 1100 North Market Street, Wilmington, DE 19890.

38.    The application was signed on behalf of the Trust in Wilmington, Delaware by a senior financial services officer for Wilmington Trust Company, as trustee of the Trust and owner and beneficiary of the prospective policy.

11

39.     After receiving the application, Hartford issued the Policy, which bore policy number VL9349278 and which provided $12,500,000.00 in coverage.

40.     As is evidenced by a "Policy Delivery Receipt" executed on or about January 19, 2006 in Wilmington, Delaware by a financial services officer for the Trust's trustee, Wilmington Trust Company, the Trust took delivery of the Policy in Delaware.

### The Policy Lacked an Insurable Interest and Was Procured Illegally on Mr. Pechter's Life

41.     The Policy lacked an insurable interest at its inception, and was procured on Mr. Pechter's life as part of a STOLI scheme in violation of Delaware's Constitution, Delaware's common law, Delaware's insurable interest statute, and Delaware's public policy. Any appearance of insurable interest was superficial only.

42.     Coventry acted through its agents to have the application for the Policy submitted to Hartford. To facilitate the transaction, Coventry created the Trust as a Delaware trust, installed Wilmington Trust Company as the trustee of the Trust, and used the Trust as a cover to procure the Policy without a valid insurable interest.

43.     The Trust was a sham and was used as a cover because it was nominally funded and was created as a means of concealing from the insurance carrier the fact that it was being used to feign technical compliance with Delaware's common law and statutory insurable interest laws.

44.     Coventry also created a sub-trust to the Trust. The sub-trust was also established as a mere cover for procuring the Policy without a valid insurable interest.

45.     In connection with originating the Policy, Coventry, acting through LaSalle Bank, N.A., entered into a non-recourse "loan" arrangement with the Trust, with the Policy serving as the sole collateral for the purported "loan."

12

46.     The purported "loan" was secured solely by a security interest in the Trust and sub-trust that held the Policy.

47.     As a result of the purported "loan," neither Mr. Pechter nor anyone with an insurable interest in his life ever paid any premiums on the Policy. Rather, the loan was used to conceal from the insurance carrier the fact that such premiums were paid by Coventry for the purpose of creating a wager on Mr. Pechter's life.

48.     Moreover, the purpose of the Policy was not to provide estate protection for Mr. Pechter or his family. Rather, Mr. Pechter was used as an instrumentality whereby strangers with no insurable interest could wager on his early demise.

49.     In 2008, approximately two years after the Policy was issued, stranger investors unrelated to Mr. Pechter took formal control of the Policy. Thereafter, the Policy traded hands on the secondary market. Eventually, Cremello acquired the Policy and became its beneficial owner. Cremello continued to hold the Policy, and to pay its premiums, until Mr. Pechter's death in 2024.

50.     As the entity that operated and managed Cremello, Jade Mountain advised Cremello to purchase the Policy and facilitated the purchase transaction.

51.     As noted above, multiple courts have considered the Coventry scheme under Delaware law and have unanimously concluded that Coventry operated a STOLI scheme and procured policies lacking insurable interest under Delaware law. Thus, when Cremello acquired the Policy, Cremello and Jade Mountain knew, or should have known, that the Policy had been procured without an insurable interest and in violation of Delaware law.

52.     As is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery, Cremello and Jade Mountain, through their agents, repeatedly invaded

Mr. Pechter's privacy and that of his family by contacting them to determine whether Mr. Pechter was still alive and to check on the status of his health.

53.     Multiple state insurance departments have condemned STOLI schemes as offending senior citizens' human dignity and as subjecting the straw insureds to various other harms, including the violation of their privacy through intrusive contact like that described above, and by misusing their private medical information to maximize their bets on the insureds' lives.

### After Mr. Pechter Died, Cremello Received the Policy's Death Benefit

54.     On August 24, 2024, Mr. Pechter died.

55.     Thereafter, as is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery, Hartford received a claim for the Policy's death benefit to be paid to Wells Fargo, as the Policy's beneficiary of record. It accepted the claim and accordingly paid the Policy's death benefit to Wells Fargo, with interest accrued from the date of Mr. Pechter's death. After receiving those proceeds, Wells Fargo passed them along to Cremello, as the Policy's beneficial owner, in accordance with Wells Fargo's obligations under its agreement with Cremello. As the entity that operated and managed Cremello, Jade Mountain facilitated, oversaw, and directed Wells Fargo's efforts in claiming the Policy's death benefit and in transferring it to Cremello.

### Two Related Cases Are Pending in the United States District Court for the District of Delaware

56.     There is a related case pending in the District of Delaware captioned *Estate of Jack Herbert Pechter, By Its Personal Representative, Shelly Pechter Himmelrich, v. Wells Fargo Bank, N.A., et al.*, C.A. No. 1:25-cv-941-CFC ("*Case No. 941*"). In that case, the Estate has brought a claim under 18 Del. C. § 2704(b) against Wells Fargo, which, as the Policy's beneficiary of record, claimed and received the Policy's death benefit before transferring the death benefit to Cremello.

"[I]n the *sui generis* context of STOLI schemes," *Malkin I*, 278 A.3d at 56, banks that—like Wells Fargo—purport to act as securities intermediaries for beneficial owners of STOLI policies are jointly and severally liable with the beneficial owners, *see id.; see also Malkin II*, 2022 WL 2285884, at *3 (affirming judgment holding STOLI policy's beneficial owner and its agent, Wells Fargo Bank, jointly and severally liable to the insured's estate); *Estate of Jayson v. U.S. Bank*, 2025 WL 2955016, at *8 (Del. Super. Ct. Oct. 20, 2025); *Estate of Long v. Wilmington Savings Fund Society, FSB*, 2025 WL 2337994, at *2 (D. Del. Aug. 13, 2025).

57.    After the Estate brought Case No. 941 against Wells Fargo, it learned that Cremello was the Policy's beneficial owner, and thus that Cremello is jointly and severally liable with Wells Fargo. The Estate proposed that the parties in that case stipulate to amending the complaint so as to add Cremello and Jade Mountain as defendants, but Cremello responded to the proposal by asserting that it was not subject to personal jurisdiction in Delaware and by stating that it would not consent to jurisdiction in Delaware. As a result, the Estate has brought its claims against Cremello and Jade Mountain in this forum, rather than asserting those claims in Case No. 941.

58.    A second related case pending in the District of Delaware is captioned *Estate of Jack Herbert Pechter, By Its Personal Representative, Shelly Pechter Himmelrich, v. U.S. Bank National Association, et al.*, C.A. No. 1:25-cv-1462-CFC ("*Case No. 1462*"). Case No. 1462 arises from another $12.5 million Hartford policy, numbered VL9349279, procured on Mr. Pechter's life at the same time, and in the same way, as was the Policy at issue in this action (and in Case No. 941). The owners of policy number VL9349279, and the recipients of its death benefit, were U.S. Bank National Association and Financial Credit Investment III SPV-B (Cayman), L.P., so the defendants in Case No. 1462 are those entities and certain of their affiliates.

## COUNT I

### RECOVERY OF INSURANCE PROCEEDS
### DUE TO LACK OF INSURABLE INTEREST
### (AGAINST CREMELLO)

59.     The Estate hereby incorporates by reference the foregoing allegations.

60.     The Policy was applied for, and the application was signed, in Delaware by a Delaware statutory trust, as the Policy's prospective owner and beneficiary. The Policy was then actually delivered to the trustee of the Trust, Wilmington Trust, in Wilmington, Delaware. For these and other reasons, the Policy is governed by Delaware law. 18 *Del. C.* § 2704(e)(4), (g).

61.     For the reasons set forth above, the Policy lacked an insurable interest.

62.     Where an insurance company pays the death benefit on a policy lacking an insurable interest, the insured's executor or administrator is entitled to recover such benefits from the beneficiary, assignee, or other payee that received the benefits as a matter of common law and statute. *See* 18 Del. C. § 2704(b); *Malkin I,* 278 A.3d at 61.

63.     The Policy's death benefit was paid to and received by Cremello.

64.     As a consequence, the Estate is entitled to receive the amount of that death benefit, plus applicable interest, from Cremello.

## COUNT II

### CIVIL CONSPIRACY TO WAGER ON HUMAN LIFE
### (AGAINST JADE MOUNTAIN)

65.     The Estate hereby incorporates by reference the foregoing allegations.

66.     The purpose of the Delaware-based STOLI conspiracy described above was, among other things, to procure an illegal wager on the life of Mr. Pechter through the Coventry program in violation of 18 Del. C. § 2704, to perpetuate the Policy until Mr. Pechter's death, and to collect the Policy's proceeds upon Mr. Pechter's death. As described in the foregoing

16

paragraphs, these acts were all contrary to Delaware law. *See Malkin I*, 278 A.3d at 65 n. 48 ("STOLI arrangements are unique in that they are not simply void *ab initio*, anathema to hundreds of years of public policy, or violative of the Delaware Constitution, but they boast all three of these unenviable qualities."); *id*. at 65 ("[B]ecause STOLI policies are void *ab initio*, when an investor receives their proceeds it … commit[s] … a violation of Article II, Section 17 of Delaware['s] Constitution and of the State's public policy.").

67.     Jade Mountain participated in this conspiracy by advising Cremello to purchase the Policy, and by facilitating that transaction; by advising Cremello to pay the Policy's premiums and to keep the Policy in effect until Mr. Pechter's death, and by facilitating those efforts; and by directing Wells Fargo to claim and collect the Policy's death benefit and to subsequently transfer the death benefit to Cremello.

68.     Moreover, in performing these acts, Jade Mountain ratified all prior acts of its co-conspirators, including those of Coventry and those of Wells Fargo, which in 2008 had entered into a contract with Coventry that required Wells Fargo to serve in various roles in connection with the program, including as a trustee for a Delaware titling trust that held Coventry-created policies.

69.     The conspiracy continued even after the Policy's proceeds were collected: with the assistance of Wells Fargo and Jade Mountain, Cremello retained the Policy's illegal proceeds, subsequently transferred them to downstream investors, and continued to conceal Cremello's ownership interest and its role in the STOLI scheme. These acts prevented the Estate from discovering the conspiracy and from asserting its rights, and they furthered the conspiracy's central objective: to profit from an unlawful wager on Mr. Pechter's life while avoiding detection and accountability.

17

70.     Jade Mountain's conduct was intentional, coordinated, and undertaken with knowledge that the Policy and the acts in furtherance of the conspiracy violated Delaware law. The Delaware Supreme Court has described similar STOLI arrangements as a "fraud upon the court." *Malkin I*, 278 A.3d at 56. Under 18 Del. C. § 2704(b), any policy procured without a valid insurable interest is void *ab initio*, and no party involved in such a scheme may retain any benefit from the policy.

71.     As a direct and proximate result of the conspiracy, Mr. Pechter and his Estate suffered damages. Among other things, the unlawful STOLI scheme constituted a wager on Mr. Pechter's life, allowing strangers with no insurable interest to profit from his death, thereby causing dignitary and emotional harm by turning Mr. Pechter into nothing more than a mere instrument for their bet on his life. Jade Mountain and its co-conspirators also intruded upon Mr. Pechter's privacy by using servicers to contact him and his family regarding his health to determine whether he was still alive, and misusing his private medical information to obtain life expectancy reports to determine whether he was likely to die soon enough to make a bet on his life profitable. The Estate has also suffered and continues to suffer monetary harm because, as a result of the conspiracy, Cremello is wrongfully retaining the Policy's illegal proceeds, to which the Estate is entitled under 18 Del. C. § 2704(b).

## COUNT III

### AIDING AND ABETTING A WAGER ON HUMAN LIFE
### (AGAINST JADE MOUNTAIN)

72.     The Estate hereby incorporates by reference the foregoing allegations.

73.     When Cremello purchased the Policy, perpetuated it, and received its proceeds, its manager and operator, Jade Mountain, knew that the Policy was an illegal STOLI policy in violation of Delaware law, and that those acts were therefore illegal under Delaware law.

18

74.     Nonetheless, as described above, Jade Mountain advised Cremello to engage in the foregoing acts and substantially assisted in and facilitated its commission of those acts.

75.     As a direct and proximate result of Cremello's actions and Jade Mountain's substantial assistance, Mr. Pechter and his Estate suffered damages. Among other things, the unlawful STOLI scheme constituted a wager on Mr. Pechter's life, allowing strangers with no insurable interest to profit from his death, thereby causing dignitary and emotional harm by turning Mr. Pechter into nothing more than a mere instrument for their bet on his life. Jade Mountain and its co-conspirators also intruded upon Mr. Pechter's privacy by using servicers to contact him and his family regarding his health to determine whether he was still alive, and by misusing his private medical information to obtain life expectancy reports to determine whether he was likely to die soon enough to make a bet on his life profitable. The Estate has also suffered and continues to suffer monetary harm because, as a result of Cremello's collection of the proceeds, Cremello is wrongfully retaining the Policy's illegal proceeds, to which the Estate is entitled under 18 Del. C. § 2704(b).

### PRAYER FOR RELIEF

WHEREFORE, the Estate requests that this Court enter judgment against Cremello and Jade Mountain in an amount equal to the Policy's death benefit proceeds, *i.e.*, $12,500,000.00, plus prejudgment interest at Delaware's legal rate under 6 Del. C. § 2301(a) running from the date when Cremello received the proceeds, compounded quarterly. The Estate further requests that this Court grant such other monetary or equitable relief as the Court deems just and proper.

Dated: New York, New York

   February 4, 2026

19

Respectfully submitted,

**COZEN O'CONNOR**

Matthew L. Elkin
3 WTC, 175 Greenwich Street, 55th Floor
New York, New York 10007
212.509.9400
melkin@cozen.com

- and -

Gregory J. Star (*PHV application forthcoming)*
Matthew Bleich (*PHV application forthcoming*)
Duncan Becker (*PHV application forthcoming*)
Carolynn Wagner (*PHV application forthcoming*)
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-2000

*Counsel for Plaintiff, Estate of Jack Herbert Pechter*